IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD MIGYANKO, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>AIMBRIDGE HOSPITALITY, LLC,<br><br>        Defendant. | 2:20-cv-1095-NR |

## <u>MEMORANDUM ORDER</u>

Ronald Migyanko filed this putative class action against Aimbridge Hospitality, LLC seeking both declaratory and injunctive relief, which would require Aimbridge to ensure that its beds and sleeping surfaces in its accessible rooms comply with the requirements of the Americans with Disabilities Act. ECF 44. Mr. Migyanko, who uses a wheelchair, alleges that the beds in Aimbridge's accessible rooms are too high for him to independently transfer from his wheelchair seat to the bed. *Id.* at ¶¶ 42-45. As a result, Mr. Migyanko claims that Aimbridge has denied him an experience that is functionally equivalent to that of the non-disabled guests of its hotels. *Id.* at ¶ 16. According to Mr. Migyanko, that's actionable discrimination under the general accessibility mandate of Title III of the ADA. *Id.* at ¶¶ 16, 49.

Aimbridge has a very different view of the case. Aimbridge argues that Mr. Migyanko's claim fails as a matter of law because he cannot point to a specific violation of the ADA's implementing regulations, the ADA Accessibility Guidelines. ECF 46, p. 5. Mr. Migyanko concedes that he cannot point to such a violation because the ADAAG is silent on bed height.

Mr. Migyanko contends, however, that he doesn't have to plead a violation of the ADAAG. ECF 55, p. 5. The United States, which filed a statement of interest in

this case, agrees with Mr. Migyanko. The United States argues that "[w]here the Department [of Justice] has not issued specific design or technical standards, public accommodations' actions are governed by the ADA's general nondiscrimination requirements and the ADA's overarching equal access mandate."[1] ECF 57, p. 4.

Mr. Migyanko and the United States are correct. As Judge Colville of this Court recently held in a virtually identical case, a plaintiff can state a "claim under the general nondiscrimination requirements of Title III of the ADA" where he or she has alleged that a hotel operator has a "policy or practice of offering only inaccessible and unusable beds" in its "purportedly accessible hotel rooms." *Mullen v. Concord Hosp. Enters. Co., LLC*, No. 20-1530, 2022 WL 295880, at *10 (W.D. Pa. Feb. 1, 2022) (Colville, J.). That's the case even though the ADA Standards "do not address, in any relevant manner, bed height specifically or even sleeping surfaces generally." *Id.* Otherwise, a hotel operator could "effectively refuse to provide its services altogether to individuals with disabilities" who "allegedly cannot use the beds" in the hotel rooms. *Id.* (citations omitted).

And that's precisely what Mr. Migyanko has alleged in this case—that Aimbridge has violated the general accessibility mandate of the ADA by failing to provide accessible beds in its purportedly accessible hotel rooms. This Court agrees

---

[1] Mr. Migyanko and the United States do disagree about one thing. Mr. Migyanko argues that "non-fixed elements, such as furniture, are expressly outside the scope of the DOJ's current regulations." ECF 55, p. 5. As such, bed heights "must be accessible under the general accessibility mandate." *Id.* The United States does not agree that bed height is outside the scope of the DOJ's current regulations. ECF 57. Rather, the United States asserts the DOJ has simply "decided not to add specific scoping or technical requirements for equipment and furniture in [its] final rule." 28 C.F.R. pt. 36, App. A, at 884 (2020). The Court need not resolve this conflict because it wouldn't change the result, which is that the Court analyzes this case under the ADA's general accessibility mandate.

with Judge Colville's holding and applies it here. As a result, the Court will deny Aimbridge's motion to dismiss. In doing so, however, the Court makes these two additional observations.

First, while the Court agrees with the concept set forth in *Mullen*, it finds the prevailing mode of analysis for addressing claims like the one presented by this case somewhat unworkable. As Judge Colville points out, in determining whether a plaintiff must allege a violation of a specific provision of the ADAAG to establish liability under the ADA, several courts, most from the Ninth Circuit, distinguish between alleged "design" violations and cases attacking a public accommodation's policies and procedures about the "use" of that design. *Id.* at *8-10. That is, "[c]laims regarding the design of public accommodation, *e.g.*, claims involving design elements controlled by the ADAAG, require a showing of an ADAAG violation." *Kalani v. Starbucks Corp.*, 117 F. Supp. 3d 1078, 1084-85 (N.D. Cal. 2015) (cleaned up), *aff'd in relevant part sub nom. Kalani v. Starbucks Coffee Co.*, 698 F. App'x 883 (9th Cir. 2017). By contrast, "for claims regarding a public accommodation's policies or practices with respect to the 'use' or 'operation' of a design element … 'the task of defining a plaintiff's burden is handled by 42 U.S.C. § 12182,' *i.e.*, the statute's more general mandate." *Id.* (quoting *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1085 (9th Cir. 2004)).

While this approach appears to provide a structured and helpful way of analyzing public accommodation cases, in practice, the distinction between a "design" and "use" case is often as clear as mud, and easily manipulated. Take this case, for example. Here, the Court could find that the height of a bed is a design element. It's part of the furnishings of the room and contributes not only to the room's functionality, but its overall aesthetics. In some cases, but not all, the bed frame is even a permanent, non-movable fixture. Thus, how is it any different from the toilet,

bathing fixtures, vanity, alarms, or telephones, all of which are indisputably "design" elements expressly covered by the ADAAG? But the Court could just as easily conclude that this case is really about Aimbridge's policy or practice of not providing accessible beds to use, which renders the hotel room essentially inaccessible to someone like Mr. Migyanko.

It seems to the Court that a different approach would be better. Rather than labor over whether the Title III claim presents a "design" or "use" case, a court should just look to see if there is a regulation that governs the specific violation alleged. If there is, then the plaintiff must allege a violation of that regulation to state a claim. If there isn't, the court analyzes the case according to the general accessibility mandate. Analyzing Title III claims in this way would emphasize the need for ADA plaintiffs to be precise when pleading their claims—if they plan to invoke a specific regulation, they have to say so. It would also provide defendants with a clearer picture of the rules of engagement.

This modified approach is also consistent with Title III and the implementing regulations. For example, it would still "give the ADAAG meaning and provide an incentive for public accommodations to abide by its standards" because those public accommodations would still be entitled to the same "safe-harbor from ADA claims implicating regulated" elements. *Kalani*, 117 F. Supp. 3d at 1085 (citations omitted). It would also address those situations, as here, "where an ADA plaintiff may encounter discrimination with respect to aspects of public accommodations that are not specifically governed by an ADAAG regulation." *Id.* And it would prevent a public accommodation from subverting the purpose of the ADA by arguing that the lack of a specific regulation permits it to do whatever it likes, even if that means its services are no longer accessible.[2]

---

[2] Indeed, taking Aimbridge's view to its logical extreme would allow a hotel to place lofted beds that are several feet off the ground in its accessible hotel rooms, making

The United States appears to agree with this modified mode of analysis because although it relies almost exclusively on the same Ninth Circuit cases establishing the "design" versus "use" framework in its Statement of Interest, there is no discussion of whether this case falls into the "design" or "use" category. *See* ECF 57, pp. 4-9. Rather, the United States puts it this way:

> The relevant question is not whether the [DOJ] could have issued specific standards for hotel bed height, but rather whether the [DOJ] did, in fact, issue such standards. The [DOJ] has not, and thus the analysis turns to the statute's general nondiscrimination provisions.

*Id.* at p. 8. This Court believes that such an approach is the right one.

Second, by denying Aimbridge's motion to dismiss, the Court is not in any way suggesting that Aimbridge has failed to make reasonable accommodations to provide an experience comparable to that afforded to non-disabled guests. The Court notes that Mr. Migyanko's theory appears to be that lowering the bed height in Aimbridge's hotel rooms is the ***only*** accommodation that is reasonable. That may or may not be the case, but it is not for the Court to decide at this point. That critical issue is more appropriately left for summary judgment, class certification, or potentially trial. Nor is it appropriate for the Court to determine "what, if any, form of injunctive relief may be appropriate should [Mr. Migyanko] prove successful in this action." *Mullen*, 2022 WL 295880, at *11. And nothing in this memorandum order should be construed to reach those issues.

* * *

For these reasons, this **4th day of February, 2022**, it is hereby **ORDERED** that Aimbridge's motion to dismiss (ECF 45) is **DENIED.**

BY THE COURT:

/s/ J. Nicholas Ranjan
United States District Judge

---

it impossible for someone using a wheelchair to even attempt to get on the bed. Such a result would contradict the legislative purpose and spirit of the ADA.